MILLARD COUNTY SCHOOL DIST. v. STATE BANK OF MILLARD COUNTY et al.

No. 5346. Decided October 6, 1932. (14 P. [2d] 967.)

*Sam Cline,* of Milford, and *Grover A. Giles,* of Fillmore, for appellants.

*Willard Hanson,* of Salt Lake City, and *E. Vance Wilson,* of Fillmore, for respondent.

STRAUP, J.

This is an appeal from the district court of the Fifth judicial district involving the right of Millard county school district in and to certain securities given it by the State Bank of Millard County to secure the payment of public funds

---

[2]*Huntington Roller Mills & Mfg. Co.* v. *Miller,* 60 Utah 236, 208 P. 531; *Bear River V. O. Co.* v. *Hanley,* 15 Utah 506, 50 P. 611.

deposited by the school district with the bank whose affairs were taken over by the state bank commissioner and are now in process of liquidation. On issues tendered between the school district and the bank commissioner, the case was tried to the court, who made findings and rendered judgment that the school district was entitled to the securities, from which the bank commissioner has prosecuted this appeal.

While the assignments present questions as to the sufficiency of the complaint and insufficiency of the evidence to support the findings as to the date on which the securities were delivered, yet the chief complaint urged and discussed is that the giving of the securities by the bank was illegal and ultra vires on the part of the bank, and a fraud upon the remaining depositors and creditors of the bank and created a preference in favor of one depositor over other depositors.

So far as material the substance of the complaint and the facts as found by the court are that the bank, organized under the laws of this state, was engaged in a general banking business in Millard county, Utah, and because of its insolvency was taken over by the state bank commissioner February 1, 1932; that for many years prior thereto the school district deposited its funds derived from taxation with the bank, and for some time prior to May, 1929, the funds so deposited were secured by the bank giving a bond or undertaking of a surety company, or by assets of the bank consisting of bonds of the United States or state or municipal bonds; that on May 11, 1929, the bank informed the school district that it was unable to longer furnish such kind of security for its deposits, but that it was able to furnish good collateral securities of the bank consisting of notes and mortgages and other securities, and listed a number of them aggregating a face value of about $86,000 which it could and would furnish as security for such deposits then with the bank and thereafter to be deposited; that on May 11, 1929, the board of directors of the bank by resolution directed and

authorized the securities to be delivered by the bank and which were delivered to and accepted by the school district "between the 11th and 15th of May," 1929; that the amount of funds that the school district then had on deposit with the bank is not alleged nor found, but it is found that on November 19, 1931, the amount of such deposits was $61,760, December 3, 1931, $80,707, December 28, $75,796, December 31, $94,406, January 7, 1932, $64,386, and on February 1, 1932, when the bank was taken over by the bank commissioner, the amount was $65,087; that at that time other public corporations, cities, towns, and the county, had deposits with the bank amounting to about $50,000, but when the bank was taken over the amount of cash on hand was only about $2,000; that in April, 1932, of the securities delivered to the school district, there were about twenty-four notes and mortgages of the face value aggregating about $64,000 due and payable in 1932 some time after February 1st, about fourteen notes and mortgages aggregating about $20,000 due and payable in 1931, and one note and mortgage of $2,030 due in 1930; that as notes and mortgages matured they were taken up and others substituted in lieu thereof, and that the face value of the notes and mortgages held by the school district when the bank was taken over aggregated about $86,000; that in April, 1932, the bank commissioner demanded of the school district possession of the securities, claiming they were improperly and unlawfully delivered to it by the bank and claimed them as assets of the bank and as such to be liquidated for the use and benefit of all depositors and other creditors of the bank; the school district, claiming the right to hold such securities as security for public funds deposited by it with the bank, refused to yield them up until the debt to secure which the securities were given was paid. Upon such allegations, the material parts of which were admitted by the bank commissioner, the only defendant appearing in the case, and upon the evidence adduced the district court held with the school district.

We have a general statute passed in 1911 relating to and entitled "State Bank Department," Comp. Laws Utah 1917, chap. 6 (section 971 et seq.) of which section 1006 is a part and, among other things, provides:

"No bank or bank officer shall give preference to any depositor or creditor by pledging the assets of the bank as collateral security; provided, that commercial banks may borrow money for temporary purposes, and may pledge assets of the bank not exceeding fifty per cent in excess of the amount borrowed as collateral security therefor," etc.

We have another separate and independent statute, passed in 1913, relating to and entitled "Public Funds," Comp. Laws Utah 1917, title 88, the whole of which is designated as section 4500 and is as follows:

"Any public officer having public funds in his custody may deposit the same, or any part thereof, with any bank incorporated under the national banking act and doing business in this state, or with any bank or trust company incorporated under the laws of and engaged in business in this state; provided, that he requires such depository to pay interest on all funds so deposited at a rate of not less than 2 per cent per annum, and that he take from such depository collateral security or a good and sufficient surety company bond or a personal bond approved by him and sufficient in amount to fully protect such funds; provided, that the cost of any official bonds required to be furnished by any public treasurer shall be paid out of funds in the respective treasuries; provided, that the interest received under the provisions of this title by the state treasurer shall be placed in the general fund."

Among other contentions, it is the contention of the school district and denied by the bank commissioner that when the securities in May, 1929, were delivered to the school district and accepted by it as security for the public funds of the district deposited and to be deposited with the bank, section 4500 was still in full force and effect and that the rights of the parties are determinative thereunder. On the other hand, it is contended by the bank commissioner that such rights are fixed and controlled by section 4500 as amended by a subsequent statute relating to and entitled "Public

Funds," and which went into effect May 14, 1929, being Laws Utah 1929, chapter 46, page 61, which, so far as here material is as follows:

"That section 4500, Compiled Laws of Utah, 1917, is amended to read as follows:

"Collection of interest required on deposits of public funds. Any public officer having public funds in his custody may deposit the same, or any part thereof, with any bank incorporated under the national banking act and doing business in this State, or with any bank or trust company incorporated under the laws of and engaged in business in this State; provided, that he require such depository to pay interest on all funds so deposited at a rate of not less than two per cent per annum, and that he take from such depository collateral security or a bond furnished by a surety company qualified to do business in this State. No collateral security shall be accepted, except bonds or other obligations of the United States, bonds of the several States of the United States, bonds or other obligations of the State of Utah, and bonds of the several counties, cities, and' school districts of this State. No security shall be accepted where there has been default within three years in the payment of principal or interest of any obligation issued by the same maker. * * * No such public officer shall in depositing funds in his custody give preference to any bank or trust company, but shall so far as practicable distribute such funds between banks and trust companies qualifying under this section, in proportion to the paid up capital stock and surplus of such qualifying banks and trust companies; provided that this shall not be construed to require any such officer to deposit funds in his custody in any bank outside the county in which his office is located. Where such public officer, in accordance with the terms and provisions of this section, has deposited and kept on deposit any public funds in his custody in a depository in strict compliance with the provisions of this section, he shall not be liable personally or upon his official bond for any public moneys that may be lost by reason of the failure or insolvency of such depository except in so far as his violation of any trust devolving upon him as such officer or any of the provisions of this section shall contribute to such loss."

The bank commissioner thus urges that the rights of the parties are to be determined by such amended statutes and that thereunder the only security which the bank lawfully

could give and the school district accept as security for the public funds was a bond or undertaking furnished by a surety company qualified to do business in the state, or bonds or other obligations of the United States or state or municipal bonds, and that none of the securities which were given and accepted were of that class or character. By the school district it further is urged that though the statute as amended applied in determing the rights of the parties, yet the primary purpose of the amended statute was to secure public funds deposited with the bank and to protect officers and custodians having in their official capacity possession or custody of public funds, and upon their compliance with the statute in such particular they are protected against any loss of public funds deposited by them, by reason of the failure or insolvency of the depository; that inasmuch as the statute, without offending the general statute forbidding prefrences to depositors, permits the giving of security for public funds deposited with a bank, the giving of the securities in question was not illegal nor against public policy, at most was but ultra vires of which neither the bank nor the commissioner could avail himself as a defense; and that if the securities given by the bank as security for the deposits of public funds be now applied in satisfaction thereof, the remaining depositors would not be harmed to any greater extent than had the bank as security for the deposits given assets or property of the bank consisting of United States bonds or state or municipal bonds.

In the case of *Pixton, State Bank Commissioner,* v. *Perry, County Treasurer,* 72 Utah 129, 269 P. 144, we had before us the consideration and construction of section 4500, supra. There, in 1919, bonds and certificates, assets of the bank, were by the cashier of the bank pursuant to authority of its board of directors, transferred and delivered to the county treasurer as collateral security for public funds deposited and to be deposited in the future by the county treasurer with the bank, which securities were held by the then treasurer and succeeding county treasurers, including the treas-

urer at the commencement of the action. The affairs of the bank, because of insolvency, were taken over by the bank commissioner in January, 1927, at which time the deposits amounted to $12,889. It there was contended by the bank commissioner that the bank had no authority to pledge any of its assets to secure funds of a depositor whether public or private funds and that to permit the bank to do so was in violation of section 1006, supra, forbidding the giving of preferences to depositors, and that to construe section 4500 as giving the bank such permission rendered the two sections in irreconcilable conflict. The commissioner thus demanded of the treasurer the return of the securities and upon his refusal brought an action to require him to do so. The judgment of the district court rendered in favor of the treasurer on appeal was affirmed. As is seen, the provision of section 4500 then was that a public officer having public funds in his custody may deposit them with a bank, etc., provided he requires such depository to pay interest on the fund "and that he take from such depository collateral security or a good and sufficient surety company bond or a personal bond approved by him and sufficient in amount to fully protect such funds." Under such section, it in the Pixton Case was urged that the proper interpretation of the section did not permit the pledging of any assets of the bank to secure deposits of public funds and that the only "collateral security" which could be given or taken was a surety company or personal bond or collateral obligation of another. We held against the contention and that the primary purpose of the statute requiring security was to protect the deposit of public funds, that the two sections, 1006 and 4500, were not in pari materia, and that section 4500, was required to be considered by itself; and if there should be any conflict between section 1006, a part of a general statute, and section 4500, a special and subsequent statute, the former was required to give way to the latter; and that the term or words "collateral security," as used in section 4500, were broad enough to include and to permit the pledg-

ing of assets of the bank as well as the giving of an independent obligation of another.

That decision was rendered in June, 1928. Section 4500 was amended and took effect May 14, 1929. The section, as amended, is entitled "Public Funds," and as the section was entitled before the amendment, and both provide that any public officer having public funds in his custody may deposit the same with a bank, etc., provided he required such depository to pay interest and took collateral security or a bond furnished by a surety company. But the section as amended further provided that "no collateral security shall be accepted," except bonds of the United States and state and municipal bonds. Before such amendment and on authority of the Pixton Case, the right of the bank to give, and of the school district to accept, the securities in question as security for the deposit of public funds is undoubted. It is alleged, and the findings supported by the evidence without substantial conflict show, that on May 11, 1929, an agreement between the bank and the school district was entered into that to secure public funds of the school district then on deposit and to be deposited, the bank gave and the school district accepted the securities in question aggregating a face value of about $86,000, that on that day the directors of the bank authorized and directed the securities to be delivered to the school district, and that "between May 11th and May 15th" they were so delivered. The court further found that the giving of the securities was in good faith on behalf of the bank as well as on behalf of the school district; and the good faith of the parties is not in any particular questioned, but is conceded, by the bank commissioner. In view of such findings the school district urges that the contract was fully executed, the securities delivered, and the deposit of the public funds permitted to remain with the bank before the amendment of the statute went into effect, and as the statute in such particular has no retroactive effect and the contract being valid when made may not be impaired or affected by the

amendment, within the well-recognized principle of law that if a contract is valid and conforms to the public policy of the state when made it is unaffected by subsequent legislation, or that a change in the law cannot make an agreement illegal which was legal when made. The doctrine is not disputed by the bank commissioner. What he, in such respect, urges is that the evidence is insufficient to support the finding that the securities were delivered between the 11th and 15th of May, and that the preponderance of the evidence shows they were delivered after May 20th. The treasurer of the school district was also the assistant cashier of the bank. He was the only witness called who gave testimony on the subject. He testified as to the resolution of the board of directors of the bank passed May 11th authorizing and directing the securities to be delivered to the school district and that he was directed to take the securities out of the filings of the bank and deliver them as security for the funds; that he received the securities at or about the time the resolution of the bank was passed, "that, to be sure I say was within five days after that; I think it was the next day, but I would say within five days to be sure; it would be no longer than that." We think such testimony supports the finding that the securities were delivered between the 11th and 15th of May. The witness further testified that as the securities matured other securities were substituted in place of them. We thus are of the opinion that since the agreement and transactions with respect thereto were made and had before the amended statute took effect, the case falls within and is to be ruled by the statute before it was amended; and adhering to the construction given the statute in the Pixton Case, it follows that the school district has the better right to the securiies for the purposes for which they were delivered to it.

Though we be in error as to that, we further are of the opinion that the same result follows if the case be considered and ruled under the statute as amended. In such particular it is argued by the bank commissioner, as was argued in

Pixton Case, that because the statute does not expressly authorize the pledging of the class or kind of securities which were given by the bank and accepted by the school district, the pledging of the assets was ultra vires, illegal, and void, and a fraud upon the remaining depositors and creditors of the bank. In support of that the commissioner chiefly cites and relies on the cases of *Divide County* v. *Baird,* 55 N. D. 45, 212 N. W. 236, 51 A. L. R. 296, and *Commercial Bank & Tr. Co.* v. *Citizens'* Tr. & G. Co., 153 Ky. 566, 156 S. W. 160, 45 L. R. A. (N. S). 950, Ann. Cas. 1915C, 166, cases cited and considered in the Pixton Case, and also relies on section 1006, supra, forbidding a bank or bank officer to give a preference to any depositor by pledging assets of the bank as security. The argument leads to the conclusion that assets of a bank may not so be pledged without creating a preference, notwithstanding section 4500 as amended, and in effect repudiates the holding in the Pixton Case. If we had to deal only with section 1006, forbidding the giving of preferences to any depositor by pledging assets of the bank, and if there were no statute requiring deposits of public funds received by a bank to be secured by it, or were it illegal or against public policy for a bank to pledge any of its assets as security for such purpose, we might have a different question before us. However, it here is apparent that the public policy of the state as indicated by section 4500 before as well as after its amendment is the same. They both relate to the same subject and purpose, the depositing of public funds in a bank and requiring the depository to pay interest and give security therefor. Thus to do that is not illegal nor against public policy. The contrary is declared and security for the deposit of public funds is expressly required and authorized.

But the particular point made is that under the section as amended different from what it was before the amendment, only a particular kind or class of assets of the bank, United States bonds and state and municipal bonds, may be pledged,

and that the assets which here were pledged did not belong to that class. In the first place it is to be noted that the giving of assets of the bank as collateral security to secure public funds is not forbidden or prohibited. The section declares that a public officer having in his possession public funds and depositing them with a bank shall "require collateral security," but that "no collateral security shall be accepted by him except" bonds, etc. In the Pixton Case we, in considering section 4500 before it was amended, held that the primary purpose requiring collateral security was to protect the fund and not the public officer depositing it. The section as amended has a double purpose: (1) To protect the fund, and (2) also to protect the officer depositing the fund. In other words, the primary purpose of the statute as amended was not to restrict the authority or power of the bank in the giving of security, but more particularly to prescribe the circumstance or condition in which the officer depositing the funds may be protected; that if he takes the class or kind of collateral prescribed by the statute as amended and does that in strict compliance therewith, he shall not be personally liable or on his official bond, for a loss of moneys so deposited by him and which may be lost by reason of the failure or insolvency of the depository. *Williams* v. *Earhart*, 34 Ariz. 565, 273 P. 728, 730.

In the next place the school district pleaded an estoppel, that the bank, having received the benefits of the deposits and the contract entered into having been fully executed, is now estopped, and so is the bank commissioner whose rights are no greater than those of the bank, from claiming and urging that the securities were given and delivered without authority; and that at most, before the bank was entitled to a return of the securities, it was required to do equity by first paying the debt or obligation for which the securities were given, and since and as found by the court that the securities were given and accepted and the transactions in respect thereto had in good faith, the bank commissioner is not entitled to any greater rights. To support that, the

school district among other cases and authorities, cites and relies on *Huntington Roller Mills & Mfg. Co.* v. *Miller*, 60 Utah 236, 208 P. 531; *Williams* v. *Earhart*, supra; 3 Fletcher, Cyc. Corpns. § 1559, p. 2631; 1. Clark & Marshall on Private Corpoations, § 212, p. 553; *Aetna Casualty & Sur. Co.* v. *Taylor, Bank Com'r*, 177 Ark. 181, 5 S. W. (2d) 929; 3 Thompson on Corporations, § 2785, p. 704; *National Sur. Co.* v. *Leflore County*, Miss. (C. C. A.) 262 F. 325, 18 A. L. R. 269; *County of Emmons* v. *Kleppe*, 61 N. D. 536, 238 N. W. 651; *Andrew* v. *Odebolt Savings Bank*, 203 Iowa 1335, 214 N. W. 559; *Liberty High School District of Sioux County* v. *Currie*, 122 Neb. 173, 240 N. W. 286.

The rule as stated and as announced in the cited cases in the main is not disputed by the bank commissioner, but he contends that the doctrine that a corporation cannot avail itself of the defense of ultra vires when the contract has been in good faith performed by the other party and the corporation has had the full benefit of the performance has no application where the contract is illegal or prohibited by statute and void when made, and that such a contract cannot be rendered valid and enforceable by performance, ratification, or by estoppel, though the corporation received the benefit of the illegal or prohibited contract; in support of which he cites *Fritze* v. *Equitable Building & Loan Soc.*, 186 Ill. 183, 57 N. E. 873; Fletcher on Corporations, § 1616; *Maryland Tr. Co.* v. *National Mechanics' Bank*, 102 Md. 608, 63 A. 70; *In re Mutual Guaranty Fire Ins. Co.*, 107 Iowa, 143, 77 N. W. 868, 70 Am. St. Rep. 149; *Strickland* v. *National Salt Co.*, 79 N. J. Eq. 182, 81 A. 828; *Divide County* v. *Baird*, supra.

We need not here review or differeniate the cited cases. Let it suffice by saying that by the great weight of judicial authority (14a C. J. § 2157 et seq., pp. 306-315) it is well recognized that there is a distinction between an illegal or void contract and one merely ultra vires. By some courts the distinction apparently has not been observed and by others repudiated, particularly as to

public corporations as distinguished from private or business corporations. The chief difficulty lies in laying down a rule or fixing a standard whereby it may be determined when a contract or transaction of a corporation is illegal and void and unenforceable, and when it is merely ultra vires and the circumstances in which, by ratification or estoppel or otherwise, it is enforceable. It may well be said that contracts and corporate acts and transactions which are malum in se or malum prohibitum, which contravene some rule of public policy, violate some public duty, or are not within the scope of the power of a corporation to perform under any circumstances or for any purpose and wholly beyond the powers of the corporation conferred upon it by its charter or the statute under which it was organized, are illegal and void and cannot support an action nor become enforceable by performance, ratification, or estoppel, and as a general rule courts in such case will not aid either party to undo the contract so far as it has been executed between the parties, nor aid in its enforcement.

As already observed, the public policy of the state as declared by section 4500, supra, before as well as after its amendment, is to require security to be given by a bank upon receiving deposits of public funds, and the bank in such particular by such statute is authorized to do so. It thus may not be said that the giving of security ■ for such purpose was beyond the scope of the power of the bank, nor is there anything made to appear that to do so was beyond the power of the bank as defined by its charter or acts of its incorporation. The most that may be said is that the bank in the exercise of the power conferred upon it acted in excess of such power by giving securities other than or different from those enumerated by the statute, and thus it may more properly be characterized as ultra vires rather than as an illegal or as a void act. Especially must that be true when by the statute the bank is required and authorized to give security for deposits of public funds

and by such statute is not prohibited nor restricted from pledging its own assets for such purpose.

The case of *Williams* v. *Earhart,* supra, cited by respondent, is, as we think, directly in point. There, as here, a public officer, the state treasurer, to secure deposits of public funds deposited in a bank took securities other than those prescribed by the statute, which securities were held by the state treasurer when the bank went into the hands of a receiver. There, as here, it was contended by the receiver that since "the statute expressly provides a method of securing the deposit of public funds in a bank, that no other security except the statutory one can be taken under any circumstances," and that if the officer took securities other than the legally specified securities the transaction was void and unenforceable. The court, holding against the contention, among other things said:

"We agree that security of the kind specified in the statute is the only kind the taking of which would exempt the state treasurer from liability on his official bond in case he deposited state money in a designated depository bank, but it by no means necessarily follows that other security, even though it does not exempt the treasurer from liability for the deposit, cannot be used by him for the protection of the latter. * * *

"Further, even if the giving of the additional security was illegal, the bank was as fully aware of that fact at the time it gave it as was defendant Earhart. We have held in the case of Williams v. Hall, 30 Ariz. 581, 249 P. 755, a case arising out of the insolvency of the same bank, that where a contract, otherwise void as against public policy, is made by a trustee for an innocent third party, the other party to the contract may not set up as against a recovery by or for the beneficiary that the contract was void as against public policy. The equities in such a case are not equal, and therefore the beneficiary may recover, notwithstanding the defect in the original contract. In this case the state of Arizona is the real beneficiary— is the innocent third party—and, following the ruling in Williams v. Hall, supra, we conclude that, assuming without deciding the taking of the pledge was contrary to law, the receiver may not repudiate the contract as against the interests of the beneficiary, the state. The alleged invalidity of the original pledge of securities, therefore, may not be raised by plaintiff in this proceeding."

In 3 Fletcher, Cyc. Corpns. § 1559, p. 2631, the author says:

"When an ultra vires contract with a corporation has been fully performed on both sides, neither party can maintain an action to set aside the transaction or to recover what has been parted with. In other words, neither a court of law nor a court of equity will interfere in such a case to deprive either the corporation or the other party of money or property acquired under the contract."

To the same effect also are 1 Clark & Marshall on Private Corporations, § 212, p. 553, and 3 Thompson on Corporations, § 2785, p. 704. In Bouvier's Law Dictionary and Encyclopedia of the Law, under the subject, "Ultra Vires," p. 3346, the author says:

"The courts may be said, generally, to be tending towards the doctrine—certainly so far as business corporations are concerned—that corporations are to be held liable upon executed contracts, where the contracts involved are not expressly or by necessary implication prohibited by their charters or the general law; Brice, Ultra Vires, 729.

"There is said to be a tendency of the courts, based upon the strongest principles of justice, to enforce contracts against corporations, although in entering into them they have exceeded their chartered powers, where they have received the consideration and the benefit of the contract. * * *

"If a contract not against public policy or a statute has been performed by the other party, the corporation is estopped to set up the defence."

To that effect is the case of *Bear River V. O. Co.* v. *Hanley*, 15 Utah 506, 50 P. 611, 614, where Mr. Justice Zane, quoting from the case of *Ohio & M. Railway Company* v. *McCarthy*, 96 U. S. 258, 24 L. Ed. 693, says that:

"The doctrine of ultra vires, when invoked for or against a corporation, should not be allowed where it would defeat the ends of justice or work a legal wrong."

In *Huntington Roller Mills & Mfg. Co.* v. *Miller*, supra, as stated in the syllabi, this court held that:

"Where a corporation received the full consideration represented by its note and mortgage, and no fraud entered into the transaction, and the indebtedness was incurred in good faith and for legitimate purposes, it could not prevail in a suit by it in equity to cancel the mortgage as being ultra vires, unless it did equity by paying the debt." Citing 3 Fletcher, Cyc. Corpns. 1543-1550.

While the general rule as to national banks established by the Supreme Court of the United States is that a national bank has the right to plead its own want of power and to assert the nullity of an act which is ultra vires, yet by the same court and other federal courts it also is held that a national bank cannot repudiate its contract as ultra vires and at the same time retain the benefits thereof, and that a recovery may be had against a bank on an ultra vires contract of guaranty to the extent to which it received benefits therefrom, 7 C. J. § 798, pp. 833, 834, and cases.

Here the bank, by reason of the contract and in consideration of the securities given by it and accepted by the school district, had in its general banking business from May, 1929, until February, 1932, public funds of the school district in amounts from $61,700 to $94,406, and when its affairs were taken over by the bank commissioner, it had used in its business $64,385 of such funds no part of which was repaid and in that amount was indebted to the school district. And unless the district be given a lien on the securities as was decreed by the district court and as in good faith was intended by the parties, the "ends of justice" will be defeated and "a legal wrong" done the school district.

The judgment of the court below is therefore affirmed, with costs to the respondent.

CHERRY, C. J., and ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.