2001 UT 64

**Thomas F. MILLER, James Kontes, and United Silver Mines, Inc., Plaintiffs and Appellants,**

v.

**CELEBRATION MINING COMPANY, Royal Silver Mines, Inc., Howard Crosby, and Does 1 through 50, Defendants and Appellees.**

No. 990521.

Supreme Court of Utah.

July 31, 2001.

the agreement was void because United had been administratively dissolved in 1991, and, therefore, could not validly enter into the April 1994 agreement. Plaintiffs appeal this decision. We affirm.

## BACKGROUND

¶ 2 "In reviewing a grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. . . . We state the facts in this case accordingly." *Tretheway v. Miracle Mortgage, Inc.*, 2000 UT 12, ¶ 2, 995 P.2d 599 (citations omitted).

¶ 3 United Silver Mines, Inc., was administratively dissolved on August 1, 1991, for failing to file an annual report. Prior to its dissolution, all of United's shares were owned by Thomas Miller and his wife, Sharon. Nearly three years after United's dissolution, in April 1994, Thomas Miller, who had been United's president, entered into a written agreement with Celebration Mining Company, the terms of which purported to transfer an interest in the Vipont Silver Mine, consisting of 53 patented lode silver mining claims on approximately 1,000 acres, from United to Celebration in three separate phases. The agreement was signed by Howard Crosby, as Celebration's chairman, and Miller, as United's president. Under Phase I of the agreement, Celebration would receive a 20% interest[1] in Vipont in exchange for issuing 1,000,000 shares of its common stock to United and another 1,000,000 shares to James Kontes. Further, Celebration would retain Kontes and Miller for $3,000 per month for at least a twelve-month period. Under Phase II, Celebration would acquire an additional 30% interest by paying $300,000 in cash to United and by removing all liens against the property before June 1, 1995. In Phase III, Celebration would receive another 30% interest for spending at least $4,000,000 on mine development before June 1, 1998.

¶ 4 Plaintiffs Miller, United, and Kontes[2] filed this action against defendants Celebra-

Samuel D. McVey, Salt Lake City, for plaintiffs.

Joseph C. Rust, Salt Lake City, for defendants.

DURRANT, Justice:

¶ 1 In April 1994, Thomas Miller, former president of the administratively dissolved corporation United Silver Mines, Inc., and Howard Crosby, the chairman of Celebration Mining Company, allegedly entered into a written agreement. This agreement purported to give Celebration an interest in the Vipont Silver Mine, which Miller represented as being owned by United, in exchange for cash, shares of Celebration's common stock, and other expenditures. Plaintiffs Miller, United, and James Kontes filed this action as a result of the alleged failure of defendants Celebration, Crosby, and Royal Silver Mines, Inc. (Celebration's successor in interest), to adhere to the terms of the agreement. Defendants moved for summary judgment. The trial court granted the motion, holding

---

1. Plaintiffs assert this was later modified to reflect a 25% interest.

2. While not a signatory to the agreement, Kontes, nevertheless, claimed a legal interest in

tion, Crosby, and Royal Silver Mines, Inc. (Celebration's successor in interest), asserting six causes of action: (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) fraud, (4) negligent misrepresentation, (5) rescission, and (6) unjust enrichment.

¶ 5 Defendants answered the complaint and filed both a counterclaim and a third-party complaint. Defendants then moved for summary judgment as to plaintiffs' claims. As to United, the defendants contended the April 1994 agreement was void because United had been administratively dissolved three years earlier and, therefore, could not properly enter into the agreement. As to Miller, the defendants contended that because he acted in his capacity as president of United in executing the April agreement, he was not a party to the agreement and therefore could not individually enforce its provisions. As to Kontes, the defendants argued he did not have standing to take part in the action as he was merely a third-party beneficiary to the agreement. In response, plaintiffs contended that because Miller acted for a dissolved corporation, he became a party to the agreement, enabling him to enforce its provisions on behalf of plaintiffs. The trial court determined the agreement was void and, accordingly, granted defendants' motion for summary judgment as to plaintiffs' claims. Plaintiffs appeal this ruling.

## ANALYSIS

■■■ ¶ 6 The only issue plaintiffs raise on appeal is whether the trial court erred in ruling that Miller could not enforce the agreement he purported to enter into on United's behalf. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "We review the trial court's summary judgment ruling[ ] for correctness." *Sur. Underwriters v. E & C Trucking*, 2000 UT 71, ¶ 14, 10 P.3d 338. We conclude the trial court's dismissal of plain-

tiffs' action was correct because the parties' agreement was voidable at defendants' option, and defendants opted to void the agreement.

■■■ ¶ 7 Plaintiffs contend this case is governed by section 16–10a–204 of the Utah Code. That section, entitled, "Liability for preincorporation transactions," provides, "All persons purporting to act as or on behalf of a corporation, knowing there was no incorporation under this chapter, are jointly and severally liable for all liabilities created while so acting." Utah Code Ann. § 16–10a–204 (1999). Plaintiffs argue that, notwithstanding its title, this section governs both pre- and post-dissolution liabilities.

¶ 8 However, even assuming section 16–10a–204 applies to contracts entered into following a corporation's administrative dissolution, that section does not address the question of whether plaintiffs have the right to enforce the agreement. Section 16–10a–204 speaks only to the *liability* of "persons purporting to act as or on behalf of a corporation." *Id.* It does not refer to any ability by such persons to *enforce* contracts.

¶ 9 As the question of whether these "persons" have the power to enforce contracts is beyond the scope of section 16–10a–204, we turn to the common law to resolve this issue. We have not previously addressed this issue. On the one hand, plaintiffs urge us to rely on the common law principle of "mutuality of obligation," which requires that where a party is held contractually liable under a given set of circumstances, that party is also able to enforce the contract on its own behalf under those same circumstances. *See Gardner v. Madsen*, 949 P.2d 785, 789 (Utah Ct.App.1997). Thus, plaintiffs argue, as Miller would be liable, under section 16–10a–204, for liabilities created while he "purport[ed] to act as or on behalf of a [non-existent] corporation," *id.*, he would also be able to enforce the agreement he entered into with Celebration when he "purport[ed] to act" on United's behalf, pursuant to the principle of mutuality of obligation.

the agreement, evidently as a third-party beneficiary.

¶ 10 On the other hand, defendants contend the agreement should be voidable at their option as they had intended to contract with United, not Miller individually. Defendants' position finds support in section 164(1) of the Restatement of Contracts. That section states, "If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient." Restatement (Second) of Contracts § 164(1)-(1981). Thus, under this section, for a contract to be voidable, it must meet each requirement of a four prong test: first, there must be a misrepresentation, second, "the misrepresentation must have been either fraudulent or material," *id.* § 164 cmt. a, third, "the misrepresentation must have induced the recipient to make the contract," *id.*, and, fourth, "the recipient must have been justified in relying on the misrepresentation." *Id.*

¶ 11 We agree with defendants that the agreement was voidable at their option. In so holding, we decline plaintiff's invitation to apply the principle of mutuality of obligation because, as demonstrated by the application of section 164(1) below, the application of the principle of mutuality of obligation in a case such as this one has great potential to create a contract one party never intended to enter.

¶ 12 We now turn to the application of section 164(1) to the facts of this case. The first requirement in applying that section is that there must have been a misrepresentation. Miller misrepresented to defendants that he was acting in his capacity as a representative of a corporate entity when, in fact, that corporate entity no longer existed.

¶ 13 The second requirement is that "the misrepresentation must have been either fraudulent or material." *Id.* The identity of the parties to a contract is, as a general rule, a material part of the contract. *See, e.g., Zurcher v. Herveat,* 238 Mich.App. 267, 605 N.W.2d 329, 336–38 & 337 n. 11 (1999) (noting the identity of the parties is an essential term of a contract involving a trans-

fer of interest in real property and citing cases). Allowing the party that misrepresented its identity to enforce the contract may compel the innocent party into a contract it might otherwise be unwilling to enter as identity is inextricably tied to one party's assessment of the other's capacity to perform on the contract. This is especially true where a contract contemplates an ongoing relationship rather than a single transaction. In this case, the agreement between the parties involved an ongoing relationship, including a minimum one-year employment term for both Miller and Kontes, as well as development of the Vipont mine over a three-year period. Whether or not the misrepresentation was made knowingly,[3] it was material to the agreement.

¶ 14 The third requirement is that "the misrepresentation must have induced the recipient to make the contract." Restatement (Second) of Contracts § 164(1) cmt. a. Where the misrepresentation is material, as here, we presume that this factor is met, "in the absence of facts showing the contrary." *Id.* § 167 cmt. b. Plaintiffs have not pointed to any facts to undermine the conclusion that the identity of the contracting party "induced [defendants] to make the contract." *Id.* § 164 cmt. a. Indeed, the record evidence cited by the parties makes clear that but for the representation that United owned the interest in the Vipont mine and was capable of entering into a joint venture with Celebration, defendants would have had no reason to enter into the contract with United. Accordingly, the third prong is met.

¶ 15 Finally, for the contract to be voidable, "the recipient must have been justified in relying on the misrepresentation." *Id.* As with the third prong, where a party relies on an assertion of a material fact, that reliance is presumed reasonable. *Id.* cmt. d. Plaintiffs have pointed to no record evidence from which we could conclude defendants were not justified in relying on Miller's misrepresentation. Miller purported to act as the president of United, and it is undisputed that at some point United did hold an interest in the Vipont mine. Under these circum-

---

**3.** Whether Miller had actual knowledge that United was dissolved when he entered the con-

tract is irrelevant to determining whether the term is material.

stances, we can only presume it was reasonable for defendants to believe United had the capability to enter into the joint venture agreement between the parties.

¶ 16 Accordingly, the requirements of section 164(1) are met in this case through Miller's misrepresentation of the identity of the. contracting party. The contract was, therefore, voidable at defendants' option, and defendants' actions make clear they wished to void the contract. Thus, we agree with the trial court's conclusion that the agreement was void and, therefore, affirm the dismissal of plaintiffs' claims against defendants.

¶ 17 Associate Chief Justice RUSSON, Justice WILKINS, and Judge ROGER A. LIVINGSTON concur in Justice DURRANT's opinion.

¶ 18 Having disqualified herself, Justice Durham does not participate herein, Third. District Judge ROGER A. LIVINGSTON sat.

HOWE, Chief Justice, dissenting:

¶ 19 I dissent. The majority errs in employing the common law to replace the Utah Revised Business Corporation Act(URBCA), which was enacted to replace common law corporate principles. The majority's deviation from the URBCA, and cases interpreting it, and the majority's failure to recognize relevant facts leave me no alternative but to dissent.

¶ 20 Utah corporations are exhaustively governed from creation to dissolution by the URBCA. *See generally* Utah Code Ann. § 16-10a-101 to 1705 (1998). The URBCA requires corporations to file an annual report with the Division of Corporations and Commercial Code. *See id.* § 16-10a-1607. Failure to file an annual report is a ground for administrative dissolution. *See id.* § 16-10a-1421(2). United failed to file its annual report and was subsequently administratively dissolved on August 1, 1991. United did not apply for reinstatement within two years of the effective date of the administrative dissolution, making the dissolution incurable. *See id.* § 16-10a-1422. The URBCA allows cor-

porations to exist post-dissolution for the purpose of winding up their business affairs.

¶ 21 In its motion for summary judgment, defendants asserted that United lacked the power to enter into the April 1994 Agreement because United had been administratively dissolved in 1991 and the agreement was not made in winding up its affairs. *See Holman v. Callister, Duncan & Nebeker*, 905 P.2d 895 (Utah Ct.App.1995). Further, defendants contended that because Miller acted in his capacity as president of United in executing the April Agreement, he was not a party to the agreement and therefore could not individually enforce its provisions.

¶ 22 Miller did not dispute that United, as a corporate entity, was dissolved when it entered into the April Agreement, and therefore could not contract post dissolution. However, Miller contended that because, as an individual, he acted for a dissolved corporation, he became a party to the April Agreement, enabling him to enforce its provisions. The court agreed with the defendants and implicitly found that the April Agreement was not made pursuant to a liquidation or winding up event. Accordingly, the court reasoned that because United entered into the April Agreement after the 1991 dissolution, it was void and therefore unenforceable by Miller. The trial court summarily stated, "[I]t is clear from the documents that Miller signed the contracts as president of United and not in his individual capacity. The nature of the contracts and consideration contemplated allow no other conclusion."

¶ 23 Plaintiffs appeal, requiring us to examine the following issues: (1) whether contracts entered into by persons purporting to act with valid corporate authority are void if the corporation has been administratively dissolved; (2) if a contractual relationship is not void under such circumstances, can the person purporting to act on behalf of the corporation individually enforce the contract. I will discuss these issues in turn.

## I. VALIDITY OF POST–DISSOLUTION CONTRACTS

¶ 24 Individuals are generally personally liable for contractual liabilities flowing from

their business dealings. Creation of the corporate shield, however, provides an exception to this general rule. *See Black's Law Dictionary* 341 (7th ed.1999). A defining feature of a corporation is the limitation of the liability of the individuals involved to the sums voluntarily contributed. 18 Am.Jur.2d § 5 *Contribution* (1985) (citations omitted).

¶ 25 In order to invoke corporate protection, individuals forming a corporation must comply with the formalities required by relevant constitutional or statutory provisions. Deviation from these formalities might render shareholders unable to claim protection under a corporate shield. In an attempt to protect individuals who had inadvertently failed to comply with the formalities of incorporation, the common law developed the doctrines of de facto corporations and corporation by estoppel. The ultimate effect of these doctrines was to provide corporate protection under principles of equity to deserving individuals.

¶ 26 The URBCA became effective on July 1, 1992. It was adapted from the Revised Model Business Corporation Act (RMBCA). Prior thereto, the Utah Business Corporation Act (UBCA) was in effect. It had been adapted from the Model Business Corporation Act (MBCA). In a case arising under the UBCA, the Utah Court of Appeals held that the common law doctrine of de facto corporations was specifically preempted by sections 16–10–51 and 139 of the UBCA because of its inconsistent application. *American Vending Servs., Inc. v. Morse*, 881 P.2d 917 (Utah Ct.App.1994); *see Murphy v. Crosland*, 886 P.2d 74 (Utah Ct.App.1994); *see also* RMBCA official comment § 2.04 (RMBCA is intended to eliminate the lack of clarity caused by cloudy interpretations of corporations de facto). Elimination of the doctrine makes individuals entering into obligations in the name of a nonexistent corporation personally liable. Importantly, this liability is not a punishment for failure to properly create a corporation, but it simply revokes the right of individuals to assert the equitable existence of a corporation as protection from personal liability.

¶ 27 The URBCA provision eliminating the de facto common law principle is section 16–10a–204, which, together with its title, states:

**Liability for Preincorporation Transactions.**

All persons purporting to act as or on behalf of a corporation, knowing there was no incorporation under this chapter, are jointly and severally liable for all liabilities created while so acting.

Although the title indicates preincorporation activity as the type of covered conduct, we have previously held that the predecessor to section 16–10a–204, which was section 16–10–139 of the UBCA, also applied to post-dissolution situations.[1] *See Steenblik v. Lichfield,* 906 P.2d 872 (Utah 1995). Utah is not alone in this conclusion. At least five other states with similar or identical statutes have held principals liable in post-dissolution situations. *See Murphy,* 886 P.2d at 81 (citing authority in five other states, with statutes identical or equivalent to section 16–10–139 that have held the statutes apply to situations in which a corporation's authority has been restricted or terminated after incorporation.) In those states, despite corporate dissolution, a principal who attempted to act on behalf of a corporation was held personally liable.

¶ 28 In *Steenblik,* Lichfield, a principal of Zephor Advisors, Inc. (Zephor), was held liable for a number of securities violations incurred by Lichfield, who entered into debt obligations with Steenblik after Zephor had been suspended by the State of Utah. *Id.* 906 P.2d at 873–75. Lichfield argued that because the corporation was suspended at the time he entered into the obligations, the contract was void. This court noted that there was a split of authority as to whether section 16–10–139 was limited to preincorporation activities or whether it could be extended to post-dissolution activities. *Id.* at 877. We elected to follow the majority rule as cited by the court of appeals in an earlier case that "Section 16–10–139 applies to all persons who

---

1. Previous section 16–10–139 was entitled "Unauthorized assumption of corporate power-Liability." The official comment to the RMBCA offers no guidance as to the reasons behind the changes in the titles of the sections.

act as a corporation without authority." *Id.* at 878 (*citing Murphy* 886 P.2d at 80 (Utah Ct.App.1994)). In *Steenblik,* we wrote,

> [N]othing in Utah's statutory history suggests Section 16–10–139 is limited to preincorporation activities.... As to corporations that have been suspended and not reinstated, we hold that officers and directors who continue the business of a suspended corporation are personally liable for all debts and liabilities arising from those types of activities the corporation performed. Under such circumstances, the relationship of persons who continue the operations of a suspended corporation is like preincorporation promoters.... Thus, persons who act as if pursuant to valid corporate authority after that authority has been suspended, are personally responsible for liabilities arising from the continued operations.

Steenblik 906 P.2d at 878 (citing *First Nat'l Bank of Boston v. Silberstein,* 398 S.W.2d 914, 915–16 (Tex.1966)).

¶ 29 In the instant case, the trial court stated that when the UBCA was repealed in 1992, former section 16–10–139 and cases interpreting the statute as applicable to post-dissolution situations failed to survive. Referring to the repeal of former section 16–10–139 the trial court stated:

> Section 16–10a–204 is somewhat similar and provides ... (language of statute deleted). This section however, is specifically directed to actions taken prior to incorporation or when incorporation fails.... Thus, the statute [section 16–10–139] ... has not, in fact, been recodified.

On the contrary, not only is former section 16–10–139 "somewhat similar" to present section 16–10a–204, it is its predecessor.[2] For reasons set out further below, I would hold that the difference in the wording of section 16–10a–204 is insufficient to warrant a different result from our decision in *Steenb-*

*lik* that section 16–10–139 applied to post-dissolution agreements.

¶ 30 I draw support in that conclusion from *Equipto Division Aurora Equipment Co. v. Yarmouth,* 134 Wash.2d 356, 950 P.2d 451 (1998), where the Supreme Court of Washington held that a statute of that state, which is identical to our section 16–10a–204, did not change the meaning of a former statute, which was identical to our former section 16–10–139, and that both statutes applied to post-dissolution contracts of a corporation. The Washington court wrote:

> If the committee had planned on narrowing the scope of the liability rule to just preincorporation transactions, the official comment [to the model act] would have made some mention of such a substantial change. As it is, the official comment says nothing about removing postdissolution situations from the scope of the liability rule."

*Id.* at 457. Minor changes in the statute did not alleviate the application of the statute to postdissolution situations.

¶ 31 Defendants contend that "[p]arties allowing their corporate status to lapse should not be able to benefit from their disregard of corporate form at the expense of innocent third parties dealing with them in good faith." The majority holds that such contracts should be void ab initio or voidable by the party not acting for a dissolved corporation. I believe the majority fundamentally misconstrues the policy behind the former section 16–10–139 and the current section 16–10a–204. They seem to presume that these statutes were designed to punish individuals who sign contracts on behalf of a corporation that has been administratively dissolved. The history of the law, however, makes clear that these statutes were enacted in order to prevent individuals from escaping liability under these circumstances. *See Murphy,* 886 P.2d at 77; *Morse,* 881 P.2d at 921. Thus, I disagree with the holding today

---

2. A brief examination of the history of section 16–10–139 is helpful. The first edition of the MBCA was published in 1950. Utah adopted verbatim section 139 of the 1950 Act as section 16–10–139. In 1968, section 139 was recodified as section 146, but the wording was unchanged. In 1984, section 139 was recodified as section 2.04 in the RMBCA, and was subsequently adopted verbatim in 1992 in Utah as section 16–10a–204. A "knowingly" element was added in the 1984 version and the title of the section was changed. *See* History, Model Act Derivation p. 2–49 (1997 Supp.); *see also* 1992 Utah Laws ch. 277, § 248, effective July 1, 1992.

that contracts entered into on behalf of defunct corporations should be void or voidable for policy reasons.

¶ 32 In short, when a corporation does not exist, consistent with section 16–10a–204, a principal is individually liable for contracts he makes. Moreover, we clearly held in *Steenblik* that contractual obligations support the liability and such obligations are not nullified because a principal signs on behalf of a defunct corporation. Accordingly, section 16–10a–204 makes the corporate principal, who signs a contract post dissolution, a party to the contract; contractual liability presupposes the existence of a contract and, therefore, contracts in these situations cannot be void under URBCA.

## II. INDIVIDUAL ENFORCEMENT OF CORPORATE OBLIGATIONS

¶ 33 Because *Steenblik* involved application of former section 16–10–139 to post-dissolution contractual liability of corporate principals, we were not required to discuss the right of principals to individually enforce such agreements. The majority incorrectly holds that section 16–10a–204 applies only to liability of "persons purporting to act as or on behalf of a corporation," and not enforcement of the contract by these same persons. The court of appeals recently addressed this particular issue in *Gardner v. Madsen*, 949 P.2d 785 (Utah Ct.App.1997). In that case, NUF, Inc., was dissolved in May 1990 for failure to file an annual report. In June 1990, NUF, Inc., through an officer of the corporation, entered into a written contract for an ownership interest in personal property. The only parties to the contract were the defendants and NUF, Inc. The defendants argued the contract was void because it was entered into by a dissolved corporation and therefore the officer could not enforce it. *Id.* at 787–89. Relying heavily on *White v. Dvorak*, 78 Wash.App. 105, 896 P.2d 85 (1995), the court of appeals held that under former

section 16–10–139 an individual who signs a contract for a nonexistent corporation can be a party to a contract and as such, can legally enforce its contractual obligations.

¶ 34 As in *Gardner*, *White* dealt directly with the contractual rights of individuals who had entered into contracts on behalf of corporations dissolved for failure to pay dues and file annual reports. *Id.* at 87.[3] Like the Millers and United in the instant case, the Whites were the only shareholders of Marlborough Properties, Inc., which was administratively dissolved for failure to file its annual report and pay its dues. Subsequently, Marlborough Properties, Inc., through Brian White, entered into an option agreement to purchase real property. In subsequent litigation over the agreement, the court held, "absent unfair prejudice, an individual purporting to act as a corporation is a party to a contract signed in the name of a nonexistent corporation. As a party, the individual can sue for breach of contract." *Id.* The *Gardner* court applied the reasoning of *White*, stating:

> Although the individual who signs for a corporation is not a party to the contract, the individual may become a party with standing to enforce the contract by 'assuming to act as a corporation without authority.' . . . The Washington court stated that all parties to the contract undeniably intended to create a valid, binding contract. Even if it is later determined that one of the parties erroneously represented itself to be a valid corporation, the contract is still enforceable. . . . Thus, 'absent unfair prejudice . . . from the use of a corporate name in the contract, [the individual purporting to act for a corporation] is a party to the contract and has an individual cause of action for its breach.

*Gardner*, 949 P.2d at 789 (citing *White*, 896 P.2d at 90).

---

**3.** Clearly, a contract is void as to the corporation itself post dissolution and we have previously so held. *See Bagnall v. Suburbia Land Co.*, 579 P.2d 914, 916 (Utah 1978) (holding deed executed by suspended corporation was a nullity because there was no showing that it was for purpose of winding-up pursuant to statute); *Houston*

*v. Utah Lake Land, Water & Power Co.*, 55 Utah 393, 400–01, 187 P. 174, 177 (1919) (holding purchase of new corporation was "wholly void" because winding-up statute bars dissolving corporation from engaging in any new business transactions.)

¶ 35 Given these interpretations of the predecessor to section 16–10a–204, I would not deviate from the URBCA as the .majority does in deciding this case under section 164(1) of the Restatement of Contracts. Instead, I would adopt the reasoning of *Gardner* and apply it to the instant case. When Miller signed the April Agreement on behalf of United, as its president, because United was no longer in existence, Miller became a party to it, liable on its terms. *See* Utah Code Ann. § 16–10a–204; *Steenblik v. Lichfield,* 906 P.2d 872. Miller became liable on the contract because the contract was not void when he signed on behalf of United. Thus, unless enforcement of the contract works unfair prejudice against defendants, we should simply look to the contract to determine the rights of the parties. *See Interwest Constr. v. Palmer,* 923 P.2d 1350, 1359 (Utah 1996) (rights of contractual parties are based on the contract itself).

¶ 36 Moreover, even application of section 164(1) does not justify making the contract voidable. The majority finds that all the requirements of section 164(1) have been met, including a fraudulent or material misrepresentation, although no evidentiary hearing has been held. This case was decided on summary judgment. At a minimum, the plaintiffs are entitled to present their evidence as to what representations were made by the parties at the time of contracting. The majority finds that Miller enticed the defendants to enter into the contract with a nonexistent corporation and that but for the such deception, they would not have agreed to its terms. It is clear from the record, however, Crosby and Celebration were well aware of Miller's ownership of all the shares of the defunct corporation as well as the substantial liens on the property. In fact, in a June 9, 1994, letter to a bank that held a judgment against Miller for debts on the Vipont Mine, Crosby twice specifically requested the bank for a "complete release to Mr. Miller," individually. Miller asserts this was always part of the original agreement in

selling a portion of the property. Kontes supports this claim by affidavit stating that several times both he and Crosby visited the bank to ascertain the amount owed by Miller. In fact, phase II of the original contract itself requires Celebration to clear the liens on the property. Therefore, Miller did not induce the defendants to enter a contract in which they would receive nothing of value. Defendants themselves have continuously represented the property as having considerable value in investment circulars and other fundraising efforts subsequent to purchasing the property. Given these facts, we should remand to the trial court to ascertain whether the defendants would be unfairly prejudiced by allowing Miller to enforce the contract.[4]

¶ 37 Since the April Agreement was signed by both parties, we must assume both parties intended at the time to perform under the terms of the agreement. 3A Arthur L. Corbin, *Corbin on Contracts,* § 546 (1960). Miller and his wife were sole shareholders of the defunct corporation. If for any reason Miller was subsequently unable to perform, the aggrieved party, Crosby, could pursue the appropriate legal recourse as in any other contractual arrangement gone bad. To that end, a party to the contract, a corporate principal in this case, would not be afforded protection from personal liability unless he met specific statutory protocol. Likewise, his right to enforce the contract would not be extinguished simply because there was no corporation in existence when the agreement was formed.

¶ 38 We should follow the URBCA which sets out the legislatively mandated method of conducting business as a corporation. The URBCA holds a corporate principal liable as a party to contracts entered into after dissolution as per our interpretation of section 16–10a–204. As a party to a contract, absent unfair prejudice, I find nothing in the URBCA which restricts the right of a principal

---

4. It is noteworthy that the April Agreement signed by Crosby (who has substantial experience in investment banking) contained no warranties or representations concerning the corporate status of United. Celebration could have easily determined for itself that United had been administratively dissolved as part of its due diligence. This fact would be pertinent in demonstrating a lack of unfair prejudice to defendants.

signing a contract for an administratively dissolved corporation to enforce it.