NUMBER 13-03-429-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


CAROL J. DRAKE, CARLENE K.

VINYARD, JANET FAY DAY, AND

CHERYL A. KURTZ, Appellants,


v.



LUCILLE SPRIGGS, ET AL., Appellees.

 


On appeal from the 343rd District Court of Aransas County, Texas.


 


MEMORANDUM OPINION



Before Justices Hinojosa, Yañez, and Castillo


Memorandum Opinion by Justice Yañez



 Appellants, Carole J. Drake, Carlene K. Vinyard, Janet Fay Day, and Cheryl A.
Kurtz, appeal a judgment in favor of appellees, Joe Zambrano d/b/a AA Pepe's Bail Bonds
and Lucille Spriggs d/b/a Lulu's Bail Bonds. On appeal, appellants raise ten issues which,
for purposes of organization, will be reordered, addressed as eight, and referred to
numerically as herein sequenced: (1) the trial court erred in entering judgment on the jury's
verdict; (2) the trial court erred in denying appellants' motion for new trial; (3) the trial court
erred in granting a motion for instructed verdict on appellants' causes of action of civil
conspiracy, conspiracy to defraud, fraud, fraudulent misrepresentation, negligent
misrepresentation, and breach of the common law express warranty for services; (4) the
trial court erred by failing to submit to the jury all grounds of recovery raised in appellants'
original petition; (5) the trial court erred in requiring appellants to make offers of proof
under the rule of optional completeness; (6) the trial court erred by improperly excluding
evidence; (7) appellants' motion to recuse judge was denied in error; (1) and (8) the trial court
erred in granting a no-evidence motion for summary judgment on appellants' Deceptive
Trade Practice Act ("DTPA") claim. (2) We reverse the summary judgment and remand the
cause for further trial proceedings.

BACKGROUND

 Appellants are the heirs of Carl J. Kurtz ("Kurtz"). (3) On September 17, 1999, a
district court in Montrose County, Colorado issued a warrant for Kurtz's arrest; the State
of Colorado had charged Kurtz with two felony offenses, conspiracy to commit murder and
criminal solicitation to commit murder, which were allegedly committed in Montrose County. 
On September 28, 1999, as a result of the outstanding warrant, Kurtz was arrested in
Aransas County, Texas and placed in the county jail. Shortly thereafter, Kurtz was
arraigned by an Aransas County judge. Though the warrant fixed bail at $500,000 for both
charges combined, bail was instead set at $1,000,000 ($500,000 for each charge). Kurtz
subsequently paid appellees, AA Pepe's Bail Bonds and Lulu's Bail Bonds, two Texas
bonding companies, a total of $100,000 ($50,000 to each) for two bonds to secure his
release from jail in Aransas County. After appellees guaranteed the two $500,000 bonds,
Kurtz was released from jail on the condition that he appear for a hearing in Montrose
County, Colorado. On November 1, 1999, Joe Zambrano, acting on behalf of himself and
Lucille Spriggs, escorted Kurtz to his advisement hearing in Montrose County. At the
hearing, Judge Richard Brown expressed concern and confusion with regard to Kurtz's
bonds and his appearance before the court. The court found that Kurtz, despite his intent
not to do so, had waived his right to contest extradition from Texas by appearing in
Aransas County. (4) Judge Brown then considered whether or not Kurtz should be required
to post an additional bond to remain out on bail. Zambrano attempted to reassure the
court that appellees would continue to hold themselves liable on the bonds in the event of
forfeiture, but the court ultimately concluded that the bonds were invalid and that appellees
were likely not subject to the court's jurisdiction in Colorado. As a result, Judge Brown
required Kurtz to post another bond from a Colorado bondsman in the amount of
$100,000. Kurtz complied with the court's order, paying a Colorado bonding company
$10,000 to help secure his release pending a trial on the two charges. After the criminal
case against him was resolved, Kurtz obtained an attorney for the purpose of recovering
a portion of the $100,000 in bonding premiums paid to appellees. Demand letters were
sent to appellees on Kurtz's behalf. The letters alleged that appellees had misrepresented
to Kurtz the validity of the bonds and the extent to which they would secure his release. 
A few months later, Kurtz died on August 5, 2001.

 On September 27, 2001, appellants, Kurtz's heirs, filed suit against appellees in
Aransas County. By way of their original petition, appellants alleged causes of action for
violation of the DTPA, fraudulent and negligent misrepresentation, breach of warranty,
breach of good faith and fair dealing, and breach of contract. Appellees raised a no-evidence motion for summary judgment as to appellants' DTPA claim, which was ultimately
granted on November 13, 2002. Trial began on March 24, 2003, and at the close of
appellants' case-in-chief, the trial court granted appellees' motion for instructed verdict on
appellants' causes of action for breach of warranty and fraudulent and negligent
misrepresentation. The trial proceeded on appellants' breach of good faith and fair dealing
and breach of contract claims. The jury ultimately returned a verdict in appellees' favor on
both claims. Appellants filed motions for new trial, judgment notwithstanding the verdict,
and to recuse the trial judge; all three motions were denied. Appellants then filed this
appeal.

ISSUES ON APPEAL

Issues 1-5

 We begin by finding that appellants have waived the first five issues on appeal. In
their brief, appellants offer no argument or authority for why they are entitled to a new trial. (5) 
Regarding their motion for judgment notwithstanding the verdict, appellants only argue that
they are entitled to JNOV because there was testimony at trial that should have constituted
a judicial admission. The testimony believed to constitute a judicial admission is not
provided for us, nor is the Court directed to any specific point in the record. We are not
told whether the alleged judicial admission constitutes some of the evidence that was
improperly excluded at trial, as appellants allege in another issue, or whether this is an
admission that was actually presented as evidence before the jury. (6) Appellants additionally
failed to provide any argument for why there was legally insufficient evidence to support
the jury's verdict. (7)

 In urging this Court to find error in the trial court's granting of instructed verdict and
its failure to submit all causes of action stated in appellants' original petition, appellants
simply refer us to numerous portions of the record. Appellants provide no legal authority
and fail to discuss the elements required to prove causes of action for civil conspiracy,
conspiracy to defraud, fraud, fraudulent misrepresentation, negligent misrepresentation,
and breach of the common law express warranty for services; appellants have also failed
to discuss how alleged facts and evidence presented establish each required element for
each cause of action asserted. (8)

 Lastly, in their complaint regarding the trial court's use of the rule of optional
completeness, outlined in rule 107 of the Texas Rules of Evidence, appellants simply
define the rule and direct us to numerous points in the record where the rule was utilized. 
Appellants make no attempt to explain how the trial court erred in its application of the rule,
nor do they explain how they were harmed by any such error. (9)

 We have little latitude on appeal and can neither remedy deficiencies in a litigant's
brief nor supply an adequate record. (10) Furthermore, we have no duty to perform an
independent review of the record and applicable law to determine whether the error
complained of occurred. (11) Because appellants failed to adequately brief the five
aforementioned issues on appeal, they have presented nothing for our review. (12)

Issue 6: Excluded Evidence

 In the sixth issue, appellants allege the trial court erred in excluding evidence that
was material and relevant to their causes of action. We review the trial judge's exclusion
of evidence under an abuse of discretion standard. (13) A trial court abuses its discretion
when it acts without regard for any guiding rules or principles. (14) To obtain reversal of a
judgment based on error in the admission or exclusion of evidence, an appellant must
show the trial judge's ruling was in error and the error probably caused the rendition of an
improper judgment. (15)

 Appellants first direct our attention to an excluded portion of Joe Zambrano's
deposition, which allegedly contains a judicial admission. This portion contains the
following exchange between appellants' counsel and Zambrano:

 Q [By counsel]: And so if that statement was not true, you received
$50,000 from Carl Jay Kurtz that you were not entitled
to; correct?


 A [By Zambrano]: Correct.

The "statement" referred to in counsel's question is the "Oath of Sureties" that Zambrano
signed on Kurtz's bail bond. The oath consisted of a sworn statement from Zambrano to
the State of Texas, whereby Zambrano swore to have a net worth greater than one-million
dollars.

 After reviewing his entire deposition, we find that Zambrano made a quasi-admission. The Texas Supreme Court, in distinguishing a quasi-admission from a judicial
admission, has stated:

 A party's testimonial declarations which are contrary to his position are
quasi-admissions. They are merely some evidence, and they are not
conclusive upon the admitter. . . . These are to be distinguished from the
true judicial admission which is a formal waiver of proof usually found in
pleadings or the stipulations of the parties. A judicial admission is conclusive
upon the party making it, and it relieves the opposing party's burden of
proving the admitted fact, and bars the admitting party from disputing it. (16) 


In order to treat a party's testimonial quasi-admission as a conclusive judicial admission,
the statement must be "deliberate, clear, and unequivocal" and "the hypothesis of mere
mistake or slip of the tongue must be eliminated." (17) Zambrano's testimony, as quoted
above, was but a small part of his deposition testimony. In other parts of his deposition,
Zambrano defends his entitlement to the money he received from Kurtz. In light of the
entire deposition, we cannot definitively exclude the possibility that Zambrano made a
"mere mistake or slip of the tongue," nor can we say that his statement was "deliberate,
clear, and unequivocal."

 The excluded evidence appellants complain of consists of Zambrano's quasi-admission, other portions of his deposition, and testimony from four other witnesses. All
of the testimony, which was excluded on relevance grounds pursuant to a motion in limine,
pertains to appellees' financial status. Appellants sought to utilize the testimony to prove
that appellees misrepresented their net worth when signing the "Oath of Sureties"
contained on each bail bond.

 We find that this evidence was properly excluded. A bondsman's misrepresentation
of net worth on a bond could possibly create a cause of action for the principal if bail was
prematurely terminated as a direct result of the misrepresentation. This, however, did not
occur in the instant case. According to the testimony of Judge Richard Brown, he required
Kurtz to post an additional bond through a Colorado bondsman because (1) appellees
were not licensed bondsmen under the State of Colorado, (2) he did not know if appellees
would be subject to Colorado's jurisdiction in the event of a bond forfeiture, and (3)
appellees' bonds were not supplemented with formal proof that substantiated appellees'
claimed net worth, as was traditionally required in Colorado. In fact, Judge Brown testified
that appellees' financial "representation actually meant nothing to [him]." There was simply
no evidence indicating that appellees' bonds were replaced as a result of any perceived
financial misrepresentation. Since the evidence relating to whether appellees actually
made financial misrepresentations was wholly irrelevant, we find that the trial court did not
abuse its discretion. Accordingly, appellants' sixth issue is overruled.

Issue 7: Motion to Recuse Judge

 In the seventh issue, appellants complain that Judge David Peeples, Presiding
Judge of the Fourth Administrative Judicial District in Texas, erred in denying their motion
to recuse Judge Janna K. Whatley. On an appeal from the denial of a recusal motion, the
reviewing court may reverse the trial court's decision only if the trial court abused its
discretion. (18)

 At the motion to recuse hearing, appellants asserted that Judge Whatley (1)
exhibited a physical demeanor that was hostile toward appellants, (19) (2) made a number of
rulings that were persistently unwarranted and biased against appellants, (20) (3) was biased
as a result of a prior employment relationship with appellees' counsel, and (4) derived an
opinion, from an extrajudicial source, that was hostile or critical of appellants' counsel. (21)

 "Judicial rulings alone almost never constitute a valid basis for a bias or partiality
motion." (22) As noted earlier, appellants waived any error pertaining to the trial court's
application of the rule of optional completeness and its granting of the instructed verdict. 
In asserting this seventh point on appeal, appellants do not reattempt to argue how these
two issues amounted to trial error, and we will again decline to construct any such
arguments for them. Since we have already determined that evidence was properly
excluded, the only trial court rulings that remain unaddressed relate to the no-evidence
motion for summary judgment and the alleged favoritism that was exercised in the
sustaining and overruling of trial objections. After reviewing the record, we do not find that
the trial court's rulings constitute any proof of bias or partiality.


 "[J]udicial remarks during the course of a trial that are critical or disapproving of, or
even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or
partiality challenge." (23) "Such remarks may [support recusal] if they reveal an opinion
deriving from an extrajudicial source, and such remarks will do so if they reveal such a high
degree of favoritism or antagonism as to make fair judgment impossible." (24) Though the
record shows that Judge Whatley's light chastising of appellants' counsel was prompted
by an extrajudicial source, as outlined in footnote 21, we find insufficient evidence of
favoritism or antagonism resulting therefrom, as is required to support recusal.

 Judge Whatley's employment under appellees' counsel, which terminated when she
became a judge, is not a relationship that explicitly warrants recusal under the Texas Rules
of Civil Procedure; nor do we believe that her impartiality should reasonably be questioned
in light of this relationship. (25) Lastly, because her complained of demeanor does not
establish bias or partiality, (26) we find that Judge Peeples did not abuse his discretion in
denying appellants' motion to recuse. Appellants' seventh issue is overruled.

Issue 8: No-Evidence Motion for Summary Judgment

 The eighth and final issue before us concerns whether the trial court erred in
granting appellees' no-evidence motion for summary judgment on appellants' DTPA claim. 
The motion was granted on the grounds that appellants had failed to present evidence
showing that appellees committed any act that was the "producing cause" of the damages
claimed. Appellants attack the motion on two grounds.

a. Appellants' Special Exceptions

 Appellants first assert the trial court erred in overruling their special exceptions to
the no-evidence motion. Appellants objected and specially excepted to the motion on the
basis that it failed to state the relief sought with specificity. In the no-evidence motion's
prayer, appellees requested the trial court to grant the motion and to award "such further
relief as the court deems just." According to appellants, the prayer should have specifically
requested that a judgment be summarily rendered that the claimants take nothing.

 We liberally construe pleadings because special exceptions are only a challenge to
determine if the "fair notice" requirements of pleadings have been met. (27) If by examining
the plaintiff's pleadings alone, we may ascertain with reasonable certainty the elements of
a cause of action and the relief sought, the pleading is sufficient. (28) We believe one may
ascertain with reasonable certainty the relief sought in appellees' prayer. Accordingly, we
find the trial court did not err in overruling appellants' special exceptions.

b. Standard of Review

 Pursuant to Texas Rule of Civil Procedure 166a(i), a defendant may move for
summary judgment on the ground that there is "no evidence of one or more essential
elements" of a plaintiff's claim. (29) Once a defendant moves for summary judgment on
no-evidence grounds, the burden shifts to the plaintiff to present evidence sufficient to raise
a genuine issue of material fact on the challenged element or elements. (30) If the plaintiff
fails to satisfy its burden, the trial court must grant the motion. (31)

 In reviewing a no-evidence summary judgment, we apply the same legal sufficiency
standard that is applied in reviewing directed verdicts. (32) Therefore, we review the evidence
in the light most favorable to the nonmovant and disregard all contrary evidence and
inferences. (33) "A no evidence point will be sustained when (a) there is a complete absence
of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving
weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove
a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the
opposite of a vital fact." (34) Thus, a no-evidence summary judgment is improperly granted
if the nonmovant brings forth more than a scintilla of probative evidence to raise a genuine
issue of material fact. (35) More than a scintilla of evidence exists when the evidence "rises
to a level that would enable reasonable and fair-minded people to differ in their
conclusions." (36) Less than a scintilla of evidence exists when the evidence is "so weak as
to do no more than create a mere surmise or suspicion" of a fact.

 The DTPA contains a list, commonly referred to as the "laundry list," of actions
declared to constitute false, misleading, or deceptive acts. (37) Private parties are
empowered to maintain an action for damages, whether economic or for mental anguish,
where a laundry-list violation is the producing cause. (38) To succeed in a DTPA laundry-list
action, a plaintiff must show that (1) he is a consumer, (2) the defendant engaged in false,
misleading, or deceptive acts, (3) on which the plaintiff relied, and (4) these acts
constituted a producing cause of the consumer's damages. (39)

 A producing cause is "an efficient, exciting, or contributing cause, which in a natural
sequence, produced injuries or damages complained of, if any." (40) Common to both
proximate and producing cause is causation in fact, including the requirement that the
defendant's conduct or product be a substantial factor in bringing about the plaintiff's
injuries. (41) While foreseeability is an element of proximate cause, it is not of producing
cause. (42)

c. Evidence of Producing Cause

 Appellants contend there was more than a scintilla of evidence to support the
producing cause element of their DTPA claim. In their original petition, appellants claimed
that appellees misrepresented that (1) they were of a financial net worth as sworn on their
bonds' "Oath of Sureties," (2) they were authorized to write bail bonds in the State of
Colorado, and (3) the bonds would be valid in the State of Colorado. Appellants
specifically claimed that these alleged misrepresentations violate the following subsections
of section 17.46(b) of the Texas Business and Commerce Code: (43)

 (b) Except as provided in Subsection (d) of this section, the term "false,
misleading, or deceptive acts or practices" includes, but is not limited to, the
following acts:

 

 . . . .

 

 (5) representing that goods or services have sponsorship, approval,
characteristics, ingredients, uses, benefits, or quantities which they do not
have or that a person has a sponsorship, approval, status, affiliation, or
connection which he does not;

 

 . . . .

 

 (12) representing that an agreement confers or involves rights, remedies, or
obligations which it does not have or involve, or which are prohibited by law;

 

 . . . .

 

 (20) representing that a guarantee or warranty confers or involves rights or
remedies which it does not have or involve, provided, however, that nothing
in this subchapter shall be construed to expand the implied warranty of
merchantability as defined in Sections 2.314 through 2.318 and Sections
2A.212 through 2A.216 to involve obligations in excess of those which are
appropriate to the goods;

 

 . . . .

 

 (24) failing to disclose information concerning goods or services which was
known at the time of the transaction if such failure to disclose such
information was intended to induce the consumer into a transaction into
which the consumer would not have entered had the information been
disclosed. (44)


Appellants also asserted that appellees' alleged misrepresentations constituted an
unconscionable action or course of action in violation of section 17.50(a)(3) of the business
and commerce code.

 When the trial court's order specifies the ground relied on for the summary judgment
ruling, as in this case, the summary judgment can be affirmed only if the theory relied on
by the trial court is meritorious. (45) Accordingly, our review is limited to whether the alleged
misrepresentations were the producing cause of damages; it does not encompass
determinations as to appellants' consumer status, nor the existence of misrepresentation
and reliance. (46)

 When we addressed issue six, relating to the exclusion of evidence, we deemed
irrelevant any evidence relating to whether appellees misrepresented their financial net
worth on the bonds. For all the same reasons already expressed therein, we find that any
such misrepresentation, if made, was not a producing cause of appellants' damages and
lends no support to their DTPA claim.

 As was also discussed in issue six, we note the deposition testimony of Judge
Brown. In the deposition, which appellants proffered to the trial court in their response to
appellees' no-evidence motion, Judge Brown stated that in his opinion, "neither one of [the]
bonds were subject to the Court's jurisdiction in Colorado and were not valid in Colorado." 
When asked if appellees' bonds were worthless, his response was that in "terms of being
a legally-recognized document in Colorado that we would accept for bonding purposes so
that Mr. Kurtz could remain out of custody pending his case resolution, they did not have
any significance for us." We thus find that Judge Brown's deposition provides some
evidence that a misrepresentation of the bonds' validity in Colorado, which encompasses
the issue of licensing, was the legal cause of appellants' damages.

 In addition to legal cause, appellants needed to prove that but for appellees'
conduct, appellants' injuries would not have occurred. (47) This means that, but for the
alleged misrepresentations of appellees, Kurtz would not have elected to secure bonds
with them. We note, however, that where the misrepresentation is material, as here, (48) we
presume that this factor is met, "in absence of facts showing the contrary." (49) Appellees did
not present evidence to rebut the presumption that misrepresentation of the bonds' validity
in Colorado induced Kurtz to enter into bonding agreements with appellees. We may thus
conclude that, but for appellees' misrepresentations, Kurtz would not have incurred the
damages in question. Accordingly, we find for appellants on this issue.

CONCLUSION

 We reverse the trial court's judgment on the DTPA claim and remand that claim to
the trial court for further proceedings. We affirm the trial court's judgment in all other
respects.


 

 LINDA REYNA YAÑEZ,

 Justice


 



Concurring and dissenting memorandum opinion

by Justice Errlinda Castillo


Memorandum opinion delivered and filed 

this the 14th day of December, 2006.

1. Appellants' issues seven and eight are addressed in our issue seven.
2. Appellants' issues one and two are addressed in our issue eight.
3. Kurtz died intestate. The appellants before us include his wife, Cheryl A. Kurtz, and his three
daughters, Carol J. Drake, Carlene K. Vinyard, and Janet Fay Day.
4. Though not applicable to our resolution of the issues presented in this case, we are inclined to
express our concern regarding the manner in which officials in Aransas County arranged Kurtz's return to
Colorado. In 1951, Texas adopted the Uniform Criminal Extradition Act ("UCEA"), presently codified in article
51.13 of the Texas Code of Criminal Procedure. Tex. Code Crim. Proc. Ann. Art. 51.13 (Vernon 2006). 
Section 16 of the UCEA states:


 Unless the offense with which the prisoner is charged is shown to be an offense punishable
by death or life imprisonment under the laws of the State in which it was committed, a judge
or magistrate in this State may admit the person arrested to bail by bond, with sufficient
sureties and in such sum as he deems proper, conditioned for his appearance before him
at a time specified in such bond, and for his surrender, to be arrested upon the warrant of the
Governor in this State.


Id. Therefore, under section 16, Kurtz should have been released on bond on the condition that he return to
Aransas County so that he could be extradited in accordance with other sections of the UCEA. Section 25a
of the UCEA, however, expressly provides that an arrested person may voluntarily waive all extradition
procedures if the waiver is made in the presence of a judge, and if the judge has informed the person of his
rights under the statute. Id. We find nothing in the record indicating that Kurtz made such a formal waiver,
and all inferences drawn from the record seemingly indicate that no formal waiver was made.

 Although a waiver signed in the presence of a judge may be the preferred method, section 25a
contains a proviso that specifically states it is not the exclusive method of securing a valid waiver. It provides
in part as follows:


 [T[hat nothing in this section shall be deemed to limit the rights of the accused person to
return voluntarily and without formality to the demanding state, nor shall this waiver
procedure be deemed to be an exclusive procedure or to limit the powers, rights or duties of
the officers of the demanding state or of this state. (Emphasis added).


On one occasion, the Texas Court of Criminal Appeals utilized this proviso in holding that formal extradition
proceedings are not necessary when returning "absconding parolees or probationers who have signed a prior
waiver of extradition as a condition to their release." Ex parte Johnson, 610 S.W.2d 757, 759-60 (Tex. Crim.
App. 1980). Accordingly, one might argue that Kurtz informally waived his rights under the UCEA by agreeing
to enter into a bonding agreement that conditioned his release on his return to Colorado; we find this
contention, however, problematic. The parole agreement in Johnson explicitly notified the parolee of his
waiver of rights; no such notice was afforded to Kurtz under his bonding agreements.

 Though no court that we are bound to follow has directly addressed what, if any, protections attach
to an informal waiver procedure, we believe that a valid waiver needs three essential elements: (1) an
unequivocal statement by the accused of his intent to waive extradition rights; (2) made voluntarily; and (3)
with some rudimentary understanding of the rights being relinquished. See McBride v. Soos, 512 F. Supp.
1207, 1212-13 (N.D. Ind. 1981), aff'd, 679 F.2d 1223 (7th Cir. 1982). These elements are not found in the
instant case. The transcript of Kurtz's initial hearing in Colorado reveals that Kurtz had never intended to
waive extradition by appearing in Colorado; it also shows that appellees' understanding of extradition law was
no better than Kurtz's. Even a Colorado state prosecutor at the hearing is quoted stating: "In all honesty,
every indication I had was that Mr. Kurtz was going to fight extradition and that he was simply bailing out of
jail in Texas, to do this hearing down there."

 The failure of Aransas County officials to follow prescribed statutory procedures has made it difficult
for this Court to decipher how and why Kurtz's bonding predicament came into existence. We have attempted
herein to rationalize the County's actions, but we ultimately find that they are without justification. We believe
that officials failed to afford Kurtz procedural due process protections as was required of them under the
UCEA.
5. See Tex. R. App. P. 38.1(h); Fed. Sign v. Tex. S. Univ., 951 S.W.2d 401, 410 (Tex. 1997); Tex. Dep't
of Pub. Safety v. Struve, 79 S.W.3d 796, 801 n.6 (Tex. App.-Corpus Christi 2002, pet. denied).
6. See Tex. R. App. P. 38.1(h).
7. Id.
8. Id.
9. Id.
10. Green v. Kaposta, 152 S.W.3d 839, 841 (Tex. App.-Dallas, no pet.) (citing Strange v. Cont'l Cas.
Co., 126 S.W.3d 676, 678 (Tex. App.-Dallas 2004, pet. denied)).
11. See id.
12. See id.; Tex. R. App. P. 38.1(h).
13. See Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998) (concluding that
the admission or exclusion of evidence is a matter within trial judge's discretion).
14. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985).
15. See Tex. R. App. P. 44.1; Owens-Corning Fiberglas Corp., 972 S.W.2d at 43.
16. Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc., 606 S.W.2d 692, 694 (Tex. 1980).
17. Griffin v. Superior Ins. Co., 338 S.W.2d 415, 419 (Tex. 1960).
18. Tex. R. Civ. P. 18a(f).
19. This consisted of rolling her eyes and appearing inattentive while appellants' counsel spoke.
20. These rulings, in large part, pertain to the application of the rule of optional completeness, the
exclusion of evidence complained of in issue five, the granting of summary judgment and instructed verdict
against appellants' causes of action, and the overruling and sustaining of trial objections in a manner that
appellants claim wholly favored appellees.
21. To demonstrate evidence of an extrajudicial source, appellants refer us to a pretrial discussion
between appellees' counsel, Robert L. Joseph, appellants' counsel, John F. Dietze, and Judge Whatley. In
the following excerpt, Dietze and Judge Whatley discuss the no-evidence summary judgment motion that had
been granted days earlier to appellees:


 COURT: Mr. Dietze, I have read that. I mean, I can talk to you about that for days. 
You do not know how many people have told me what you thought about my
ruling on that. It's gotten back to me. That's okay; I understand. 
Disagreements are good. That's fine. I've read it. I feel like I know the
case very well and I'm comfortable with my ruling. Court of Appeals may tell
me I'm wrong and I'll be glad to redo it at that time.


 DIETZE: May I inquire of the Court who has told you about my-what I vocalized about
my opinion of the ruling?


 COURT: I am trying to recall. No one that's a party in the case. I can tell you that. 
Someone said something to me in Sinton that you were totally dismayed
with me over my ruling. And that's okay; that's fine. I just wish you'd come
tell me. Okay.


 DIETZE: Judge, I tried-I tried to tell you in the form of a motion for reconsideration. 
I wrote you two letters.


 COURT: Don't talk about me to other people, though. That's my only-that's my only
- that's my only thing is it did upset me that you did that. But I can't recall
who it was. I promise you it wasn't Mr. Joseph or any of the parties in this
case. It was somebody totally unrelated. That's why I was like . . . If I think
about who it is, I'll be glad to tell you.
22. Liteky v. United States, 510 U.S. 540, 555 (1994).
23. Id.
24. Ludlow v. DeBerry, 959 S.W.2d 265, 271 (Tex. App.-Houston [14th Dist.] 1997, no writ).
25. See Tex. R. Civ. P. 18b.
26. Liteky, 510 U.S. at 555 (holding that "judicial remarks during the course of a trial that are critical or
disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or
partiality challenge").
27. See Wortham v. Dow Chem. Co., 179 S.W.3d 189, 198-99 (Tex. App.-Houston [14th Dist.] 2005,
no pet.). 
28. Id. at 198.
29. Tex. R. Civ. P. 166a(i).
30. See id.; Branton v. Wood, 100 S.W.3d 645, 647 (Tex. App.-Corpus Christi 2003, no pet.) (citing
Tex. R. Civ. P. 166a cmt.). 
31. See Branton, 100 S.W.3d at 647 (citing Lampasas v. Spring Ctr., Inc., 988 S.W.2d 428, 433 (Tex.
App.-Houston [14th Dist.] 1999, no pet.)).
32. King Ranch, Inc. v. Chapman, 118 S.W.3d 742, 750-51 (Tex. 2003); Zapata v. Children's Clinic, 997
S.W.2d 745, 747 (Tex. App.-Corpus Christi 1999, pet. denied). 
33. King Ranch, 118 S.W.3d at 750; Zapata, 997 S.W.2d at 747 (citing Merrell Dow Pharms., Inc. v.
Havner, 953 S.W.2d 706, 711 (Tex. 1997); Moore v. Kmart Corp., 981 S.W.2d 266, 269 (Tex. App.-San
Antonio 1998, pet. denied)).
34. King Ranch, 118 S.W.3d at 751 (quoting Merrell Dow Pharms., 953 S.W.2d at 711). 
35. Id. (citing Tex. R. Civ. P. 166a(i); Wal-Mart Stores, Inc. v. Rodriguez, 92 S.W.3d 502, 506 (Tex.
2002)).
36. Id. (quoting Merrell Dow Pharms., 953 S.W.2d at 711). 
37. Tex. Bus. & Com. Code Ann. § 17.46(b) (Vernon 2006); Checker Bag Co. v. Washington, 27 S.W.3d
625, 634 (Tex. App.-Waco 2000, pet. denied) (citing Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 386 (Tex.
2000)). 
38. Tex. Bus. & Com. Code Ann. § 17.50(a)(1) (Vernon 2006). 
39. Henry Schein, Inc. v. Stromboe, 102 S.W.3d 675, 705 (Tex. 2002) (citing Tex. Bus. & Com. Code
Ann. § 17.50(a)(1); Checker Bag, 27 S.W.3d at 634).
40. Union Pump Co. v. Allbritton, 898 S.W.2d 773, 775 (Tex. 1995).
41. Id.
42. Id.
43. In their original petition, appellants listed causes of action under section 17.46(b)(19) and (23),
rather than subsections (20) and (24) as we have listed herein. Appellants failed to account for statutory
revisions to the DTPA that were made effective approximately four weeks prior to the filing of their petition. 
When the revisions became effective, causes of action which would have been pleaded under subsections
(19) and (23) were now renumbered as subsections (20) and (24). This defect was not addressed at trial nor
has either party made it an issue on appeal. We have been apprised of this defect through appellants'
petition, which described each wrongly numerated subsection with sufficient detail to alert us of their intended
pleadings. We have elected to set out those causes of action that appellants clearly intended to raise in this
opinion.
44. Tex. Bus. & Com. Code Ann. § 17.46(b)(5), (12), (20), (24) (Vernon 2006). 
45. See State Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374, 380 (Tex. 1993).
46. The record reveals that during a pretrial discussion of appellees' no-evidence motion, Judge
Whatley expressed to appellants the evidentiary problems she had with their DTPA claim. Judge Whatley
called into question whether there was any evidence showing that Kurtz and appellees had specifically agreed
to enter into bonding agreements that would survive beyond Kurtz's initial hearing in Colorado. This
evidentiary issue, however, begs the question of whether a misrepresentation exists, not whether any such
misrepresentation is a producing cause; we view these two issues as two distinct elements that a party must
prove when asserting a DTPA cause of action. However, we do believe, without formally holding on the
matter, that the transcript of Kurtz's Colorado hearing provides more than a scintilla of evidence that Kurtz and
appellees intended for the bonds to survive longer than they actually did.
47. See Prudential Ins. Co. v. Jefferson Assocs., Ltd., 896 S.W.2d 156, 161 (Tex. 1995).
48. "A misrepresentation is material if it would be likely to induce a reasonable person to manifest his
assent." Restatement (Second) of Contracts § 162 cmt. c. We find that a misrepresentation as to the
duration for which a bail bond will secure release undoubtedly concerns a material matter.
49. See Restatement (Second) of Contracts § 162 cmt. c.; Provident Life & Accident Ins. Co. v. Hawley,
123 F.2d 479, 483 (4th Cir. 1941); Miller v. Celebration Mining Co., 2001 UT 64, 29 P.3d 1231, 1235 (Utah
2001).